

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:08cr516

PHUOUNG NGUYEN LE


### MEMORANDUM OPINION

This matter is before the Court on the defendant's MOTION
TO WITHDRAW PLEA DUE TO LEGAL INNOCENCE (Docket No. 26).   For
the reasons set forth below, the motion will be granted.


### BACKGROUND

**A. Factual History**

The parties, by and large, do not dispute the material
facts.   The Defendant, Phuong Le, is a 49-year-old who lived in
Vietnam until 1991, at which time he relocated to a Malaysian
refugee camp with his family following his release from prison.
(Def. Mem. at 2.)   Le had been imprisoned for "political
reasons."  (Id.)  Le and his family, including his first wife,
moved to the United States in 1998, when they were granted
refugee status. (Id. at 3.) Le became a naturalized citizen in
2004 and divorced his wife in the same year.  (Id.)   During
several trips to Vietnam throughout the period of 2004 to 2007,
the Defendant met and married his current wife, My Nga Ly. (Id.)

Ms. Ly applied for a visa to visit the United States, but her application was denied. (Id.) Le requested information about the denial from Congressman Bobby Scott; Scott obtained a letter from Charles Bennett, the Consular Chief in Vietnam, which stated that Ly's application had been denied because there was no evidence of a "*bona fide* relationship" between her and Le. (Id.)

Upset by this news, Le sent a letter to Congressman Scott that made references to the Virginia Tech shootings of 2007, threatened to decapitate Bennett, and indicated that Le planned to commit suicide. (Gov. Mem. at 5.) The letter was also smeared with Le's blood. (Id.) Le states that his letter was not intended to threaten, but rather to insult, and somewhat belatedly, has blamed his lack of understanding of English language and a difference in cultures for the misunderstanding. (Def. Rep. at 2.)

## B. Procedural History

Le was charged with a violation of 18 U.S.C. § 876, Mailing Threatening Communications, in a one count Indictment on December 15, 2008. Le pled guilty to that charge on February 4, 2009; and the guilty plea was taken by a Magistrate Judge, who issued a report and recommendation that the Court accept Le's guilty plea on the same day. The Magistrate Judge conducted an

2

extensive colloquy with Le before accepting his guilty plea. (See Hr'g Tr. at 2-28.) The Court approved the report and recommendation on February 19, 2009.

A sentencing hearing was held for Le on April 24, 2009, at which time Le, and his counsel, indicated that Le might seek to withdraw his guilty plea. Subsequently, Le filed a motion to do so, and the United States responded. In his motion, Le made reference to expert testimony that he alleged to be relevant to his claim of actual innocence. (Def. Rep. at 2.) Thereafter, the Court ordered Le to proffer both the qualifications of the expert witness and the substance of the proposed expert testimony. (Docket Number 29.) Le has now provided that information.

## DISCUSSION

After entering a plea of guilty, a defendant may withdraw that plea only if he demonstrates a "fair and just reason" for withdrawal. Fed. R. Crim. P. 11(d)(2)(B). The Fourth Circuit has set forth six factors that are to be considered in making the determination whether the defendant has met the burden to show a fair and just reason. See United States v. Moore, 931 F.2d 245, 248 (4th Cir. 1991). Thus, a district court should consider:

3

>(1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

Id. While not independently dispositive, the first of these factors is the most important. A properly-conducted Fed. R. Crim. P. 11 colloquy, of course, weighs heavily against granting a motion to withdraw a guilty plea. See United States v. Faris, 388 F.3d 452, 456 (4th Cir. 2004).

## A. Knowing and Voluntary

Before accepting a guilty plea, the presiding court "must inform the defendant of, and determine that he understands, the nature of the charge(s) to which the plea is offered, any mandatory minimum penalty, the maximum possible penalty and various rights" as set forth by Fed. R. Crim. P. 11(c)(1). U.S. v. DeFusco, 949 F.2d 114, 116 (4th Cir. 1991). "[A]n appropriately conducted Rule 11 proceeding raises a strong presumption that the plea is final and binding." United States v. Wilson, 81 F.3d 1300, 1306 (4th Cir. 1996). Furthermore, statements made by the defendant during the course of such a proceeding are presumed to be true. See id. at 1308.

4

Le argues that his plea was not knowing and voluntary because he did not understand the charges brought against him because of so-called "language difficulties." (Def. Mem. at 6.) Evaluating a similar claim in the Fifth Amendment context, which also requires a knowing and voluntary waiver of rights, the Fourth Circuit has noted that, while a limited understanding of English is a relevant factor in the inquiry, it is not necessarily dispositive. See United States v. Guay, 108 F.3d 545, 549 (4th Cir. 1997). Factors relevant to the issue of whether the waiver was knowing and voluntary include "1) whether the defendant indicated in the affirmative when asked if he or she understood his or her rights; 2) whether the defendant indicated that he or she understood English; 3) the length of defendant's residency within the United States; and 4) defendant's previous encounters with the criminal justice system." United States v. Monreal, 602 F.Supp.2d 719, 722 (E.D.Va. 2008)(citing United States v. Moreno, 122 F.Supp.2d 679, 681 (E.D.Va.2000)). When a defendant claims that he lacks sufficient understanding of the English language to understand a Rule 11 waiver, his conduct and responses during the Rule 11 colloquy are the cornerstone of the knowledge and voluntariness analysis. See United States v. Hernandez-Hache, 41 Fed.Appx.

671, 672 (4th Cir. 2002)(per curiam)(unreported); United States v. Lopez, 7 Fed.Appx. 272, 273 (4th Cir. 2001) (unreported).

Le clearly answered in the affirmative when asked whether or not he understood his rights. (Hr'g Tr. at 14-20.)  Le additionally indicated that he could speak English, and the record shows that an interpreter was present at the hearing as a "safety precaution." (Id. at 13.)  Le's counsel has further stated that she had an interpreter present during her private meetings with Le when the issue of a guilty plea was discussed. However, counsel represents that she was not fully satisfied with the interpreter's services. (Def. Mem. at 4.)  Le had resided in the United States for approximately 10 years before the hearing and he had a sufficient understanding of American governmental operations to contact his congressman with a question about governmental services. (Id.)

Furthermore, as indicated in the presentence report, Le has had several previous encounters with the criminal justice system over the past five years and, in fact, had entered guilty pleas to several of those charges. (Presentence Report at ¶¶ 33-38.) On this record, the Moreno factors suggest that it is not appropriate to find that Le's plea was involuntary on the basis

of a lack of understanding of the English language.[1] This conclusion is supported by the Fourth Circuit's decision in Guay, in which it found that a defendant with a tenuous grasp of the English language could voluntarily waive his rights even without an interpreter present. See 108 F.3d at 549-50.

Nonetheless, the record also shows that Le's counsel was sufficiently uncertain about her level of lingual skills to arrange for an interpreter when meeting with him. Also, an interpreter was present at the plea colloquy. While these facts do not counsel a finding of involuntariness or lack of knowledge, they suggest that Le's comprehension of English is limited. That, in turn, can be considered in analyzing whether Le has met the burden to show a fair and just reason for withdrawal of the plea. And, that is so even if the evidence on that point is insufficient to constitute a basis for finding that the plea was not knowing or voluntary.

## B. Credible Assertion of Innocence

The second Moore factor requires a determination whether a defendant seeking to withdraw his plea has credibly asserted his innocence of the charges. See 931 F.2d at 248. The defendant's

---

[1] Indeed, a close reading of the Defendant's motion indicates that Le did not misunderstand the guilty plea process, but rather only potentially misunderstood the elements of the offense of his conviction. (See Def. Mem. at 4.) This concern is better addressed under the second Moore factor, a credible assertion of innocence.

statements during the plea hearing may be accorded "strong weight" in determining whether his assertion of innocence is credible. See Faris, 388 F.3d at 458.   The presiding court should consider both the legal impact and credibility of the factual assertions made by the defendant. See U.S. v. Sparks, 67 F.3d 1145, 1151 (4th Cir. 1995).

Le argues that the statute under which he was charged, 18 U.S.C. § 876(c), requires that the perpetrator mail a communication knowing that the content of the communication was a threat. (Def. Mem. at 5.)   In support of this contention, Le points to a recent Supreme Court decision, in which the Court held that, in general, a *mens rea* term appearing in a statute applies to all subsequent phrases in the statute, unless the contrary is indicated. See Flores-Figueroa v. United States, 129 S.Ct. 1886, 1891 (2009).   Le argues that, because he was linguistically and culturally incapable of understanding that his communication was threatening, he could not have possessed the required *mens rea*. (Id.)   Le proffers expert testimony to support his factual claims. (Def. Rep. at 2.)   The United States argues that no *mens rea* requirement is attached to the "threat" element of § 876. (Gov. Mem. at 4.)

The relevant statute provides:

> [w]hoever knowingly . . . deposits or causes to be delivered . . . any communication with or

8

> without a name or designating mark subscribed
> thereto, addressed to any other person and
> containing any threat to kidnap any person or any
> threat to injure the person of the addressee or
> of another

is guilty of a crime. 18 U.S.C. § 876. The Fourth Circuit has stated that §876 creates a specific intent crime, but only insofar as the act of mailing is concerned. See United States v. Worrell, 313 F.3d 867, 874 (4th Cir. 2002). However, the court of Appeals also has held that "the defendant must have a general intent to threaten the recipient at the time of the mailing." United States v. Maxton, 940 F.2d 103, 106 (4th Cir. 1991). This general intent "can be gleaned from the very nature of the words used in the communication; extrinsic evidence to prove an intent to threaten should only be necessary when the threatening nature of the communication is ambiguous." Id. The communication must also encompass a "true threat" - a communication that a "reasonable recipient who is familiar with the context of the letter would interpret [] as a threat of injury." Worrell, 313 F.3d at 874. A similar construction of the statute is in use in most other circuits. See United States v. Geisler, 143 F.3d 1070, 1072 (7th Cir. 1998) (collecting cases), but see United States v. King, 122 F.3d 808, 811 (9th Cir. 1997) (§ 876 requires a specific intent to threaten).

9

There can be no reasonable dispute that a letter smeared with blood that contains a threat to decapitate another individual, a reference to a notorious massacre, and a threat to commit suicide is a "true threat" under the objective standard set forth by Maxton. See 940 F.2d at 106. Le has not argued that he did not knowingly place that communication in the mail. Therefore, the remaining question in assessing whether there is a credible showing of innocence is his mental state respecting the threat contained in the letter which he admittedly sent.

The parties disagree on the relevant *mens rea* standard. The respective positions of both the Defendant and the United States derive from a misreading of the applicable Fourth Circuit precedent, compounded by the somewhat unclear language appearing in Worrell. However, both sides entirely ignore the requirement, found in both Worrell and Maxton, that the perpetrator must have the general intent to threaten at the time that the communication is mailed. See Worrell, 313 F.3d at 874; Maxton, 940 F.2d at 106 ("We find implicit [in the statute] a requirement that the defendant must have a general intent to threaten the recipient at the time of the mailing."). Indeed, the Fourth Circuit in Maxton used the presence of that intent requirement to overrule the defendant's First Amendment objection to the statute. See id. The United States attempts to

10

conflate the "true threat" requirement with the "general intent" requirement in order to read out any *mens rea* requirement applicable to the threat itself. (Gov. Mem. at 4-5.) The Defendant commits a similar misreading, and applies Flores-Figueroa in an attempt to add such a requirement. (Def. Mem. at 4.)

It is certainly true, as the Fourth Circuit points out, that, in most cases, the existence of a "true threat," by its very nature, will be sufficient evidence to establish a general intent to threaten. See Maxton, 940 F.2d at 106. The Fourth Circuit, however, clearly contemplated situations in which additional evidence might be necessary to establish *mens rea*: "most of the time such intent can be gleaned from the very nature of the words used in the communication; extrinsic evidence to prove an intent to threaten should only be necessary when the threatening nature of the communication is ambiguous." Id. There is language in the Worrell opinion that elides over this distinction, but the Fourth Circuit does not explicitly eliminate the distinction. See 313 F.3d at 874 ("[t]he government is required to prove only a general intent to threaten under § 876, see United States v. Maxton, 940 F.2d 103, 106 (4th Cir. 1991), which means that the communication must "encompass a 'true threat'.")

The application of the rule set forth in <u>Flores-Figueroa</u>, calls for a slightly different analysis of the *mens rea* standard in § 876, however. <u>See</u> 129 S.Ct. at 1891.  The Supreme Court, in that case, stated that when, "Congress use[s] the word 'knowingly' followed by a list of offense elements," the statute should be read to apply that term to all of the following elements. <u>Id.</u> at 1895.  This rule was based on norms of statutory construction and the regular application of the principles of English grammar. <u>See</u> <u>id.</u> at 1891-94. Additionally, the rule of lenity calls for the court to adopt the construction of an ambiguous criminal statute that is most favorable to the defendant. <u>See</u> <u>id.</u>  The interpretive guideline used in <u>Flores-Figueroa</u> should be applied when no other interpretive practice or practical problem of enforcement suffices to overcome the ordinary meaning of the words. <u>Id.</u> at 1895.  The Supreme Court applied the attachment presumption to hold that the term "knowingly" applied to all of the *actus reus* elements of the crime of aggravated identity theft codified at 18 U.S.C. § 1028A(a)(1). <u>Id.</u>

This presumption also has been applied in several other Supreme Court cases in different statutory contexts. <u>See</u> <u>id.</u> at 1894 (collecting cases); <u>see also</u> Model Penal Code § 2.02(4) (2001) (setting forth the same presumption to be used in

interpreting code sections). Indeed, the Eighth Circuit recognized the possibility that the interpretive presumption discussed in Flores-Figueroa, as it was earlier discussed in Liparota v. United States, 471 U.S. 419, 424-25 (1985), should be applied to § 876. See United States v. Floyd, 458 F.3d 844, 848 n.3 (8th Cir. 2006).

The Fourth Circuit, in Maxton and Worrell, failed to identify any interpretive guideline, practical problem, or piece of legislative history that compelled it to deviate from the standard of construction that is set forth in Liparota and Flores-Figueroa. See Worrell, 313 F.3d at 874; Maxton, 940 F.2d at 106. Therefore, the appropriate course is to apply the "knowingly" standard to all of the elements of the offense in § 876, as called for by the interpretive guidelines discussed in Flores-Figueroa. That mode of statutory construction has a better pedigree and more recent endorsement than the Fourth Circuit's summary addition of an "implicit" general intent standard. See Maxton, 940 F.2d at 106; Flores-Figueroa, 129 S.Ct. at 1891-95.

In the context of § 876, however, the difference between a general intent to threaten, as outlined in Fourth Circuit precedent before Flores-Figueroa, and mailing a communication that the mailer knows to contain a true threat, as the Supreme

13

Court's statutory construction guideline would dictate, is in large measure a distinction without a difference. It is difficult to imagine any reasonable factual circumstance in which only one, but not the other, of these two requirements would be satisfied.

The circumstantial evidence in the case – the history between Le and Bennett and the language in the communication – is sufficient to establish a *prima facie* case for either knowledge or a general intent to threaten. See Maxton, 940 F.2d at 106 (general intent to threaten can be proven by the content of the communication); 1 Devitt and Blackmar, Federal Jury Practice and Instructions, § 17.07 (4th ed. 1992) (knowledge may be proven by circumstantial evidence). However, Le has offered evidence in support of his motion in the form of expert testimony that, in Le's culture and in his language, the communication would not be threatening. This kind of evidence is generally regarded as being potentially relevant to the issue of *mens rea* in a criminal proceeding. See Syriani v. Polk, 118 Fed.Appx. 706, 709 (4th Cir. 2004)(unpublished)(cultural evidence used in defense); United States v. Prince-Oyibo, 320 F.3d 494, 496 (4th Cir. 2003) (same); Cynthia Lee, Cultural Convergence: Interest Convergence Theory Meets the Cultural Defense, 49 Ariz. L. Rev. 911, 912-15 (2007) ("Defendants may

offer cultural evidence to show that they lacked the mental state required for commission of the charged offense or to bolster a traditional criminal law defense, such as self-defense, insanity or provocation.") (collecting cases)(internal citations omitted).

Dr. Leung, Le's expert, offers conclusions about the subjective meanings of Le's words as they were communicated in the letter. (See Def. Ex. 2 at ¶¶ 6-10.)  In that regard, his testimony is closely analogous to the explanation of coded drug language frequently offered by police officers acting as experts. See United States v. Wilson, 484 F.3d 267, 275 (4th Cir. 2007).  Therefore, his testimony should be considered as experiential, rather than scientific, expert testimony. See id. at 274-75.  In order to qualify a witness who offers experiential expert testimony, the district court must require the witness to "explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (internal quotations omitted).

Dr. Leung is a medical doctor specializing in psychiatry with a degree from Virginia Commonwealth University. (Def. Ex. 2 p. 1.)  Dr. Leung has extensive experience dealing with the psychiatric problems of Asian-Americans in general, and

15

Indochinese individuals particularly, having held several positions in that arena. (Id. at p. 2.) Furthermore, Dr. Leung has published several works in what are apparently peer-reviewed publications and given presentations at professional seminars that pertain to the issues concerning the effects of cultural differences in psychiatry. (Id. at pp. 3-10.) Additionally, Dr. Leung previously has been admitted as an expert in Vietnamese culture in the courts of several other states. (Def. Ex. 1 at ¶ 3.) Thus, Dr. Leung appears to possess the required basis in experience and expertise to be qualified as an expert witness in the area of Vietnamese culture and the cultural divides between Vietnamese and American customs. See Wilson, 484 F.3d at 274-75.

Dr. Leung formed his opinion based on his interview of Le, his discussion about the case with Le's attorney, and his background in psychiatry and Vietnamese culture. (Def. Ex. 1. at ¶ 4.) Dr. Leung further explains, albeit in somewhat general terms, how his knowledge of Vietnamese culture and language applies to the facts at issue in Le's case. (Id. at ¶¶ 7, 9.) While not dispositive evidence, this methodology is analogous to the methodology utilized by drug-language and street culture experts in drawing their conclusions. See Wilson, 484 F.3d at 274-76. Therefore, Dr. Leung's testimony would likely be admissible on the issue of the subjective meaning of the

16

letter's text, an issue which, if accepted by a jury, would permit a finding in Le's favor on the issue of Le's *mens rea*.

Amidst a flurry of conclusions of questionable relevance and admissibility, Dr. Leung makes three salient statements. First, Dr. Leung states that the phrase "cut his head off," as idiomatically used in Vietnamese, expresses an insult rather than an actual threat. (Def. Ex. 1. at ¶ 7.)  Second, Dr. Leung states that Le's act of smearing the letter with blood is a Vietnamese tradition called "letting blood," which has the effect of vouching for the truthfulness of the content of the document. (Id. at ¶ 9.)  These points support Le's argument that he had no general intent to threaten and/or knowledge that his letter contained a threat and, thereby, they support Le's claim of actual innocence.

Finally, Dr. Leung opines that Le, due to his limited grasp on the English language and American culture, would not have realized that those statements and actions could lead to another individual feeling threatened. (Id. at ¶ 8.)  That testimony may not be admissible in that form but Dr. Leung likely would be permitted to testify to the closely-related proposition that the difference in language and culture would lead a Vietnamese not to appreciate that the English language used could constitute a threat.  If that is what Dr. Leung intends to convey, it likely

17

would be admissible and, if it is admitted, would be further evidence probative of Le's asserted innocence.

Of course there is significant contrary evidence. Dr. Leung does not explain how the stated intent to decapitate and smearing of the blood should be read in the context of the references to the Virginia Tech massacre and Le's threat of suicide. (Gov. Mem. at 5.) These are undoubtedly violent images, and frame the remainder of the letter in a more threatening tone. Therefore, Dr. Leung's conclusions about Le's subjective meaning are thrown into doubt by the presence of that unexplained context.

Furthermore, Le had been in the country for over ten years at the time the letter was sent, and had significant contacts with the English-speaking justice system and English-speaking authorities. (Def. Mem. at 4.) The likelihood that Le would misunderstand the threatening nature of the content and style of his communication is reasonably called into doubt by his long experience in America and with English speakers.

Taken as a whole, the record shows that Le has made a non-frivolous showing of legal innocence. That evidence is not particularly strong, but it creates factual issues which, if resolved in Le's favor by a jury, could result in acquittal. The second Moore factor, therefore, weighs in his favor.

18

## C. Delay

The third <u>Moore</u> factor asks whether there was a delay between the entering of the plea and the filing of the motion to withdraw it. <u>See</u> 931 F.2d at 248. Neither party argues this factor in its briefing. Le first raised the possibility that he would withdraw his guilty plea during his sentencing hearing on April 24, 2009 – approximately two-and-a-half months after he entered his guilty plea. The Fourth Circuit in <u>Moore</u> stated that a period of six weeks was a sufficient to constitute a "long delay[]." 931 F.2d at 248. The Fourth Circuit has also noted that a delay can typically be found when the motion occurs "on the eve of sentencing". <u>See</u> <u>United States v. Cline</u>, 286 Fed.Appx. 817, 821-822 (4th Cir. 2008) (unreported) (finding delay when the motion was filed "nearly three months after [the defendant's] Rule 11 hearing and only three days before her sentencing hearing."). Therefore, this factor weighs against Le. However, the record here also shows that communication between counsel and Le was made difficult by Le's limited English language capability and that ameliorates the delay factor.

## D. Assistance of Competent Counsel

The fourth <u>Moore</u> factor asks whether the "defendant has had close assistance of competent counsel." 931 F.2d at 248. A

19

defendant who claims that he has not received the benefit of advice from competent counsel must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that "but for counsel's errors, the defendant would not have pled guilty and would instead have insisted on proceeding to trial." Faris, 388 F.3d at 459. Therefore, by necessity, in order for this factor to weigh in favor of the defendant, his counsel at the time must have made some error. See id.; see also Sparks, 67 F.3d at 1153.

Le does not directly argue that his counsel did not competently assist him, but such an argument can be drawn from his briefing. (See Def. Mem. at 4-5.) Le states that his counsel could not have competently assisted him due to the language barrier, until a better interpreter was used. (See id.) On the other hand, it is undisputed that Le stated that he had received competent assistance and that Le's counsel stated that she believed that a guilty plea was appropriate. (Hr'g Tr. at 16, 30-31.) Le faces a high hurdle in attempting to overcome these statements made during a properly-conducted Rule 11 colloquy. See United States v. Ubakanma, 215 F.3d 421, 425 (4th Cir. 2000).

The question, therefore, is whether Le's counsel's performance was "reasonable under prevailing professional norms,

and in light of the circumstances." <u>United States v. Bowman</u>, 348 F.3d 408, 416 (4th Cir. 2003). There can be no doubt that Le's counsel's performance was reasonable under the circumstances. While, apparently, there was a failure in interpretation between Le and his counsel, Le's counsel had no way to know of that failure at the time. (<u>See</u> Def. Mem. at 4-5; Def. Rep. at 2.)

Similarly, Le cannot satisfy the second half of the test for whether he received the advice of competent counsel, because his counsel made no discernible error; therefore, there was no error that could have caused his guilty plea. <u>See</u> <u>Faris</u>, 388 F.3d at 459. Indeed, the Fourth Circuit has previously noted that a non-negligent misunderstanding on the part of an attorney is not sufficient to render representation incompetent. <u>See</u> <u>Sparks</u>, 67 F.3d at 1153.

Nonetheless, the language barrier and counsel's lack of understanding respecting the cultural and language differences pointed to by Dr. Leung suggest that this factor is a neutral one in this case. Certainly, it would have been best if counsel's dissatisfaction with the interpreter in the pre-plea process had been resolved by arranging for the services of another interpreter. And, it would have been desirable for counsel to have been read in earlier on the cultural and language issues explained by Dr. Leung. Those two circumstances

21

do not permit a finding on this factor adverse to Le's request for withdrawal of the plea.

### E. Prejudice

The fifth _Moore_ factor is whether the Government will be prejudiced if the defendant's plea is withdrawn. See 931 F.2d at 248. The simple costs of putting on a trial do not represent prejudice to the Government; instead, the Government must demonstrate specific costs resulting from the entry and later withdrawal of the plea. See _Faris_, 388 F.3d at 459-60. The United States has not argued that it would be prejudiced by the delay, and no source of prejudice is apparent from the record. Further, Le is correct that the issues at trial will largely concern his intent, and no evidence going toward that point has been spoiled by the delay. (Def. Mem. at 2.) Therefore, this favor weighs in favor of Le.

### F. Waste of Judicial Resources

The final _Moore_ factor asks the presiding court to determine whether allowing the plea to be withdrawn will inconvenience the court and cause a waste of judicial resources. See 931 F.2d at 248. In analyzing this factor, the Court should not consider "routine requirements that arise in most criminal cases" or requirements present "in most cases in which the defendant seeks to withdraw a guilty plea." _Faris_, 388 F.3d at

22

460.  It is appropriate to consider whether the defendant has a "legitimate interest in withdrawing his guilty plea to test the possibility of acquittal at trial." Id.

Neither party has addressed this factor in briefing. However, this factor is, at best, neutral here.  As noted above, Le has a colorable argument respecting his guilt, and that argument is largely based on the credibility of his testimony. Therefore, Le does have a legitimate interest in testing the possibility of acquittal.   Le's argument is not strong. Therefore, this factor does not weigh strongly in favor of either party.

## CONCLUSION

For the foregoing reasons, the Moore analysis instructs that, in this case, Le has shown a fair and just reason for withdrawing his guilty plea, notwithstanding that the record reflects a fully complete and satisfactory Rule 11 colloquy. This is one of those few cases that circumstances not made known to the Magistrate Judge dispel the presumption created by an adequate colloquy.   On this record, it is fair and just to permit Le to withdraw his guilty plea.  Counsel have been so

23

informed by a telephone conference and the case will be set for trial.

It is so ORDERED.

_____ /s/ _____ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  September 14, 2009